## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ROBERT E. LAMB,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 07-CV-183-PJC** |
| | ) | |
| **MICHAEL J. ASTRUE, Commissioner,** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

Claimant, Robert E. Lamb ("Lamb"), pursuant to 42 U.S.C. § 405(g), requests judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying claimant's application for disability benefits under the Social Security Act.  In accordance with 28 U.S.C. § 636(c)(1) and (3), the parties have consented to proceed before a United States Magistrate Judge.  Any appeal of this order will be directly to the Tenth Circuit Court of Appeals. Lamb appeals the decision of the Administrative Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly determined that Lamb was not disabled.  For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

### Lamb's Background

Lamb was born on June 19, 1968, and was 38 years old at the time of the ALJ's decision. (R. 22, 53).  He has a high school education. (R. 16).  Lamb's past relevant work includes working as a meat cutter and meat manager at the medium exertion level. (R. 405). These jobs are both classified as skilled.  *Id.*  Lamb alleges an inability to work beginning July 11, 2002, due to depression, anxiety, back pain, hypertension, leg pain and attention deficit hyperactivity

disorder ("ADHD"). (R. 16, 53). He also claims to suffer from problems with his liver, hands, wrists, knees, ankles, feet, neck, shoulders, elbows and stomach. *Id.*

Lamb's medical problems began when he was injured at work on July 11, 2002. (R. 122). When Lamb was lifting a box of meat somewhere between 80 and 100 pounds, he felt a sharp pain in his back that continued throughout his hip when walking. *Id.* He was treated at Springer Clinic for these problems on the date of the accident. *Id.* A medical imaging report from Hillcrest Medical Center on August 1, 2002 revealed that Lamb had a herniated disc at L5-S1. (R. 124).

From July 12, 2002 to September 22, 2002 Lamb was treated at Bewley Chiropractic. (R. 125-155). On his first visit he was diagnosed with the following problems in the lumbar region: facet joint swelling, myospasm, lumbar sprain/strain, disc bulge and lateral nerve encroachment ("LNE"). (R. 152). Dr. Darrick Davis at the Bewley Chiropractic recommended that Lamb refrain from work until July 20, 2002. (R. 148). That deadline was later extended until July 25. (R. 147). When Lamb was seen on July 24, he was evaluated and his progress was noted as improving as expected under his current medical care. (R. 143). Dr. Davis said Lamb's prognosis and disability were unknown at that time. *Id.* At that time, the deadline for Lamb to return to work was extended by Dr. Bewley until August 5, 2002. (R. 141). The deadline to return to work was continually pushed back and was finally set at September 28, 2002. (R. 132-140). Throughout these numerous extensions, Lamb continued to receive regular chiropractic therapy. (R. 126-131, 133-136).

Lamb received three different lumbar epidural steroid injections in his back for the pain. (R. 157). This was performed by Dr. Dale E. Dautenhahn with Greater Tulsa Anesthesiologists,

PLLC. (R. 156). After the first injection on August 27, 2002, Lamb reported profound three day relief, and after his second injection on September 10, 2002, he had a longer relief from his pain. *Id*. After those two injections Lamb reported the pain had returned overall with the pain level decreasing from an 8 to a 7. *Id*.

On December 16, 2002, Lamb had a microdiskectomy and hemilaminectomies by Dr. Steven C. Anagnost. (R. 208). This surgery was performed on Lamb's back because he was still experiencing pain after utilizing all forms of less invasive treatment. *Id*. On March 4, 2003, Lamb was seen by rehabilitation specialist Dr. Jean Bernard for continued low back pain. (R. 221). Dr. Bernard's impression was that Lamb had low back pain due to many factors including: herniated nucleus puposus L5-S1 with central canal foraminal stenosis; status post microdiskectomy at L5-S1; neuropathic pain; anxiety; and muscle imbalance. *Id*. At that time, Lamb was given another injection in his back to relieve pain. (R. 222). Dr. McCormack at Health South Diagnostic Center of Tulsa saw Lamb on March 7, 2003 and found disc protrusion at L5-S1 and a focal disc bulge on the right L5-S1 foramen. (R. 224).

Lamb returned to see Dr. Anagnost after experiencing extreme back pain while watching a baseball game from the bleachers on May 7, 2003. (R. 225). Dr. Anagnost diagnosed Lamb with disc space collapse, and surgery was performed with the goal of bringing Lamb's pain level from 8-9/10 to 2-3/10. (R. 229). Lamb was hospitalized from May 7 to May 10, 2003, and upon discharge, Dr. Anagnost noted that Lamb was stable, with "marked improvement with neurologic status and ambulating well with therapy." (R. 244-45).

In a follow up visit on June 10, 2003, Dr. Anagnost stated that Lamb had marked improvement in his symptoms and back pain. (R. 272). At an August 12, 2003 visit, Dr.

Anagnost stated that Lamb was doing very well overall, but Dr. Anagnost expressed concern with Lamb's work as a meat cutter, stating that lifting 60-80 lbs on a very regular basis would be difficult, given Lamb's surgery.  (R. 269).

On September 30, 2003, and December 9, 2003, Lamb saw Dr. Anagnost again, and the decision was made to remove Lamb's hardware in his spine in a further attempt to reduce Lamb's pain.  (R. 266-67).  In his report from the September 30 visit, Dr. Anagnost stated that his opinion was that returning to work as a meat handler would be quite difficult.  Dr. Anagnost further stated that after the hardware removal, he believed Lamb would be able to return to work, but not at his former occupation. (R. 267).   Surgery was performed January 5, 2004.  (R. 256-57).

On February 3, 2004, Dr. Anagnost stated that Lamb experienced excellent improvement of back pain and leg pain.  He included this statement regarding Lamb's ability to work:

> We discussed his condition for the future.  I think we can return him back to work as a meat cutter lifter.  As he has to lift truck loads of meat frequently would be unreasonable for him and might exacerbate or worsen his back pain. [sic].  I think it is safe for him to lift as tolerated; however, I do not feel that he should lift repetitively.  I would keep his repetitive lifting less than 50 lbs and he should avoid ladders as well.  Otherwise, he should be able to resume his normal regular activities.  He is dismissed from the office at this time.

(R. 265).

Lamb saw Dr. Thomas E. Madaj on June 15, 2004, for complaints of arthralgias and low back pain. (R. 320).  Lamb reported pain in the back, hands, knees, right leg and foot.  Dr. Madaj adjusted some of Lamb's prescription medication and ordered x-rays and laboratory work.  (R. 320-21).  Dr. Madaj saw Lamb for follow up on July 27, 2004, and referred Lamb to Dr. Lawrence A. Jacobs, a rheumatologist.  (R. 318-19).  Dr. Jacobs saw Lamb on August 25, 2004,

concluding that Lamb's symptoms were "without good findings for systemic rheumatic disease and marginal findings for fibromyalgia." (R. 312). Dr. Jacobs did raise a question of "seronegative spondyloarthropathy." *Id.*

Dr. Madaj saw Lamb on August 20, 2004, for diarrhea symptoms, and then again on August 27, 2004. (R. 316-17). On August 27, Dr. Madaj's impressions were that Lamb suffered from chronic pain syndrome, primarily of the back, chronic fatigue, depression, and possible hypertension. His plan was to await further results from Dr. Jacobs. (R. 316). There are no further treatment records of either Dr. Madaj or Dr. Jacobs in the file. However, after the March 14, 2006 hearing before the ALJ, Lamb's attorney submitted a letter from Dr. Madaj dated March 16, 2006, which stated:

> Mr. Lamb has a history of chronic low back problems. He has undergone surgery for this in the past and is currently taking medications for the condition. This letter is to reiterate recommendations previously made for periods of rest (perhaps 10 minutes out of every hour of work).

(R. 352-53).

Lamb was diagnosed with fatty liver on November 11, 2003. (R. 249). On December 4, 2003, a biopsy was performed that confirmed these results. (R. 250-251).

On February 5, 2004, Lamb was diagnosed with a single mild episode of major depression and ADHD by Dr. Stephen Greer. (R. 331). Lamb was prescribed Ritalin for the ADHD. *Id.* In a progress note dated April 22, 2004 Lamb reported to Dr. Greer that he felt he was slowly improving. (R. 330). At that time, Lamb was on medication for his depression and ADHD. *Id.* On September 27, 2004, Dr. Greer reported that Lamb was taking medication for his depression and was "doing pretty good overall right now." (R. 329).

A Psychiatric Review Technique and Medical Consultant Review Form were completed on December 6, 2004. (R. 337-51). It was noted that ADHD and major depressive disorder were present. (R. 338, 340). Restriction of activities of daily living, difficulty in maintaining social functioning, and difficulty in maintaining concentration, persistence or pace were all found to be mild in their degree of limitation. (R. 347). Repeated episodes of decompensation were listed as "none" in the degree of limitation. *Id*. The consultant found Lamb's mental impairments to be not severe. (R. 351).

On June 28, 2004, a Physical Residual Function Capacity Assessment was performed by Dr. Vallis D. Anthony. (R. 300-08). Degenerative disc disease was the primary diagnosis. (R. 300). Lamb's exertional limitations were the following: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; push and/or pull unlimited. (R. 301). The postural limitations placed on Lamb included occasionally climbing a ladder, balancing, stooping, kneeling, crouching, and crawling. (R. 302).

Lamb describes himself as a very active 34 year old until his accident on July 11, 2002. (R. 83). Lamb can no longer engage in his active lifestyle and partake in activities such as riding horses and four wheelers, water skiing, and playing sports. *Id*. Lamb has difficulty playing with his children and reports having behavioral issues with his family because of his pain and anger. *Id*. It takes Lamb longer to complete household tasks such as cleaning and cooking and he often needs help from his wife. (R. 84). Lamb is still able to cut his lawn on his riding lawnmower, but can only do half the yard in one day. (R. 85).

6

Lamb feels that prior to the accident he could do everything with ease and now has difficulties in daily life.  *Id.*  Lamb needs to lie down and rest or take a nap during the day and cannot remain active or sedentary for longer than a few hours.  (R. 97-98).  Lamb must now rely on his children to help out around the house and needs someone to help him push a shopping cart at the grocery store.  (R. 101).  Most days, Lamb doesn't feel like getting out of bed due to the pain and difficulties he incurs.  (R. 109).  Lamb attends part-time vocational rehabilitation at OSU Okmulgee in the culinary art's department.  (R. 116).  Lamb drives to and from school each day which is around 50 miles one way, and during this trip he usually has to stop and rest.  (R. 398).

## Procedural History

On May 6, 2004, Lamb applied for disability benefits under Title II (42 U.S.C. § 401 *et seq.*), and for Supplemental Security Income benefits under Title XVI (42 U.S.C. § 1381 *et seq.*).  (R. 53).  Lamb's application for benefits was denied in its entirety initially and on reconsideration.  (R. 38, 44).  A hearing before ALJ Gene M. Kelly ("ALJ") was held on March 14, 2006, in Tulsa, Oklahoma.  (R. 15).  By decision dated July 27, 2006, the ALJ found that Lamb was not disabled at any time through the date of the decision.  (R. 22).  On February 8, 2007, the Appeals Council denied review of the ALJ's findings. (R. 6).  Thus, the decision of the ALJ represents the Commissioner's final decision for purposes of further appeal.  20 C.F.R. §§ 404.981, 416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. §423(d)(1)(A).  A claimant is disabled under the Act only "if his

physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work which exists in the national economy." 42 U.S.C.

§423(d)(2)(A).   Social Security regulations implement a five-step sequential process to evaluate

a disability claim.  20 C.F.R. §§ 404.1520, 416.920. [1]

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g).  This Court's review is limited to two inquiries: first, whether the decision was supported

by substantial evidence; and, second, whether the correct legal standards were applied.  *Hargis v.*

*Sullivan*, 945 F.2d 1482, 1486 (10th Cir. 1991).

Substantial evidence is such evidence "as a reasonable mind might accept as adequate to

support a conclusion."  *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2002) (citation omitted).

In reviewing the decision of the Commissioner, the court "may neither reweigh the evidence nor

substitute [its] judgment for that of the agency."  *Id.* (citation omitted).   Nevertheless, the court

examines "the record as a whole, including whatever in the record fairly detracts from the weight

---

[1]    Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by
20 C.F.R. §§ 404.1510, 416.972.  Step Two requires that the claimant establish that he has a medically severe
impairment or combination of impairments that significantly limit his ability to do basic work activities.  *See*
20 C.F.R. §§ 404.1520(c), 416.920(c).  If the claimant is engaged in substantial gainful activity (Step One) or
if the claimant's impairment is not medically severe (Step Two), disability benefits are denied.  At Step Three,
the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1.
A claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment
is determined to be disabled without further inquiry.  If not, the evaluation proceeds to Step Four, where the
claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past
relevant work.  If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish
at Step Five that work exists in significant numbers in the national economy which the claimant, taking into
account his age, education, work experience, and RFC, can perform.  *See Dikeman v. Halter*, 245 F.3d 1182,
1184 (10th Cir. 2001).  Disability benefits are denied if the Commissioner shows that the impairment which
precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. §§ 404.1520,
416.920.

8

of the Secretary's decision and, on that basis, determine[s] if the substantiality of the evidence test has been met." *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800-01 (10th Cir. 1991).

### Decision of the Administrative Law Judge

At Step 1, the ALJ found that Lamb had not engaged in substantial gainful activity since July 11, 2002.  (R. 16).   At Step 2, Lamb had the following severe impairments: depression, anxiety, back pain, hypertension, leg pain, ADHD, and pain in the liver, hands, wrists, knees, ankles, feet, neck, shoulders, elbows and stomach.  *Id*.  At Step 3, the ALJ found the impairments above neither singularly nor in combination met or equaled a listing in Appendix 1, Subpart P, Regulations No. 4.  (R. 17).

The ALJ found that Lamb had the RFC to perform a limited range of sedentary work, with exertional and non-exertional limitations.  (R. 21). At Step 4, the ALJ determined that Lamb could not perform his past relevant work as a meat cutter or meat manager.  At Step 5, the ALJ determined that there were other jobs existing in significant numbers in the national and regional economies that Lamb could perform, based on his RFC, age, education, and work experience.  (R. 20-21).  Even though there were additional restrictions on Lamb's range of sedentary work, the ALJ determined Lamb could still perform a significant number of jobs in the national economy.  (R. 21).  The ALJ concluded Lamb was not disabled under the Social Security Act at any time from July 11, 2002 through the date of the decision.  (R. 22).

**Review**

Lamb asserts that the ALJ erred:  (1) by failing to include all of Lamb's limitations in his formulation of Lamb's RFC; and (2) by determining Lamb can perform other work in the national economy based upon his RFC.

**I. RFC Assessment**

Lamb asserts that the ALJ did not take into account all of Lamb's limitations in determining his RFC, referring specifically to the note from Dr. Madaj suggested Lamb be allowed to rest for "perhaps 10 minutes out of every hour of work."  (R. 353).  Lamb claims that it was error for the ALJ not to include this limitation in his determination of Lamb's RFC.

The ALJ made the following determinations regarding Lamb's RFC:

> To lift and carry 10 pounds. He can stand and/or walk 6 hours in an 8-hour workday at 1 ½ hour intervals and sit 6 hours in an 8-hour workday at 1 hour intervals. He can occasionally climb, bend, stoop, squat, kneel, crouch, crawl, push and pull, operative foot pedals, reach overhead, twist/nod head. He is slightly limited in fingering, feeling and grasping and must avoid environments where he would be exposed to rough and uneven surfaces, unprotected heights, fast and dangerous machinery, cold and requires easy access to the restroom. He requires simple, repetitive and routine work and is slightly limited in contact with the public, coworkers and supervisors.

(R. 17).

A treating physician's opinion must be given "substantial weight" unless good cause dictates otherwise.  *Frey v. Bowen*, 816 F.2d 508, 513 (10th Cir. 1987).  If the opinion is disregarded, reasons for that determination must be given.  *Id*.  The rejection must be because of contradictory medical evidence and must not be due to an ALJ's own credibility judgments, speculation, or lay opinion.  *McGoffin v. Barnhart*, 288 F.3d 1248, 1252. (10th Cir. 2002).

In the present case, the ALJ did not ignore the letter from Dr. Madaj, and the ALJ discussed it and gave specific reasons for discounting it:

> The opinion is inconsistent with the claimant's testimony about his current activity levels. The claimant testified he could sit for an hour and stand one and a half hours at a time. He said that he cooked and performed his household chores. He drives a great deal. These activities coupled with his surgeons release to medium work, lead the Administrative Law Judge to conclude that the claimant can perform at a greater activity level than the one set out by Dr. Madaj. It is also noted that Dr. Madaj is relying on the claimant's complaints rather than any significant findings by diagnostic testing.

(R. 19).

This discussion by the ALJ is an appropriate consideration of factors supporting his discounting Dr. Madaj's opinion. First, it is legitimate to contrast Lamb's own testimony regarding his ability to sit and stand, as well as his daily activities, with Dr. Madaj's statement that Lamb required rest for every hour of work. The ALJ gives specific examples to support this contrast. Second, the ALJ is correct to cite to the opinion of another treating physician, Lamb's surgeon, who released Lamb to a limited range of medium work. Third, it is proper for the ALJ to note that Dr. Madaj's opinion was not based on extensive diagnostic testing. *See White v. Barnhart*, 287 F.3d at 907-08 (Tenth Circuit would not reweigh evidence when the ALJ's discounting of treating physician's opinion was based on legitimate factors such as lack of objective medical evidence supporting treating physician's opinion, inconsistencies in the treating physician's records, and the relatively brief length of the doctor-patient relationship); *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007)(no error where ALJ "provided good reasons in his decision for the weight he gave to the treating sources' opinions"). As was true in *White* and *Oldham*, in the present case the ALJ gave specific and proper reasons for discounting

11

the weight given to Dr. Madaj's opinion, and there was no error in that portion of the ALJ's decision.

## II. Ability to perform other work in the national economy

Lamb asserts the ALJ erred at Step 5 by finding Lamb could perform other work in the national economy based on his RFC.  Lamb contends that the ALJ did not properly evaluate the factors approved by the Tenth Circuit in *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir. 1992), in determining whether the Commissioner met his burden at Step 5.  The existence of jobs in "significant numbers" is required by the social security statutes, and in *Trimiar*, the Tenth Circuit declined to drawn a "bright line establishing the number of jobs necessary to constitute a 'significant number.'" *Id.*  Instead, the Tenth Circuit approved factors to be considered by the ALJ which might include the level of disability; the reliability of the VE's testimony; the distance claimant can travel for work; and the nature and availability of these jobs.  *Id.*

Lamb asserts that the ALJ's decision fails at Step 5 because the ALJ accepted the VE's testimony as a conclusion and did not evaluate any of the factors approved by the Tenth Circuit in *Trimiar*.  In a lengthy paragraph of his decision, the ALJ reviewed the testimony of the VE. The relevant portion of the ALJ's decision states as follows:

> Next the vocational expert was asked if there were other jobs in the national economy, existing in significant numbers that the claimant could perform.  The vocational expert testified that at the sedentary exertional level, provided that the claimant stayed within the above set out restrictions, there were jobs available, in the national economy that the claimant could perform.  Examples of such jobs are: assembly, 9,750 jobs regionally and 80,250 nationally; and machine operator, 8,250 jobs regionally and 68,250 nationally.  The Administrative Law Judge finds that these are representative of a significant number of jobs available in the national economy that the claimant can perform.  Pursuant to SSR 00-4p, the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

(R. 20).

The ALJ's determination in the present case was proper, and the VE's testimony constitute substantial evidence supporting the ALJ's conclusion that significant numbers of jobs exist in the national economy that Lamb can perform. *See Qualls v. Apfel*, 206 F.3d 1368, 1373 (10th Cir. 2000).  Given the testimony of the VE that there are thousands of jobs available in the region, the Court finds *Trimiar's* discussion of factors to be unnecessary because it relates to situations where the number of jobs, as described in testimony of a VE, is much more marginal than in the present case.  Even if an explicit *Trimiar* analysis were required in the present case, however, the Court would find the ALJ's decision to be adequate.  Throughout the ALJ's decision, he discussed factors mentioned in *Trimiar*, such as Lamb's level of disability, the reliability of the testimony of the VE, the average of 2-3 hours a day Lamb spends driving his car (R. 18), and the nature and availability of the jobs.  The ALJ's finding that significant numbers of jobs exist that Lamb can perform with his RFC is supported by substantial evidence.

**Conclusion**

The decision of the Commissioner is supported by substantial evidence and the correct legal standards were applied.  The decision is **AFFIRMED.**

DATED this 15th day of August, 2008.

Paul J. Cleary
United States Magistrate Judge